IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON

KAREN FRANCES RAIRDEN,

     Plaintiff,

v.                                    CASE NO. 2:10-cv-00063

MICHAEL J. ASTRUE,
Commissioner of Social Security,

     Defendant.

## PROPOSED FINDINGS AND RECOMMENDATION

This is an action seeking review of the final decision of the Commissioner of Social Security denying the Claimant's application for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-1383f.   This case was referred to this United States Magistrate Judge by standing order to consider the pleadings and evidence, and to submit proposed findings of fact and recommendation for disposition, all pursuant to 28 U.S.C. § 636(b)(1)(B).

Plaintiff, Karen Frances Rairden (hereinafter referred to as "Claimant"), filed an application for SSI on June 19, 2007, alleging disability as of November 7, 1987, due to borderline intellectual functioning, dysthymia, social phobia, and right foot drop.[1] (Tr. at 10, 103-05, 124-34, 154-59, 172-76.)  The claim was

---

[1]  On December 1, 1987, a prior application for SSI (child) was filed on behalf of Claimant.  The claim was denied initially on January 6, 1988.  On October 25, 1989, a prior application for SSI

denied initially and upon reconsideration.  (Tr. at 59-63, 66-68.)
On  August  19,  2008,  Claimant  requested  a  hearing  before  an
Administrative Law Judge ("ALJ").  (Tr. at 71-73.)  The hearing was
held on January 14, 2009 before the Honorable Rossana L. D'Alessio.
(Tr. at 84, 22-56.)  By decision dated February 19, 2009, the ALJ
determined that Claimant was not entitled to benefits.  (Tr. at 10-
21.)   The  ALJ's  decision  became  the  final  decision  of  the
Commissioner on November 24, 2009, when the Appeals Council denied
Claimant's request for review.  (Tr. at 1-5.)  On January 25, 2010,
Claimant brought the present action seeking judicial review of the
administrative decision pursuant to 42 U.S.C. § 405(g).

      Under  42  U.S.C.  §  423(d)(5)  and  §  1382c(a)(3)(H)(I),  a
claimant  for  disability  benefits  has  the  burden  of  proving  a
disability. See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir.
1972).  A disability is defined as the inability "to engage in any
substantial  gainful  activity  by  reason  of  any  medically
determinable physical or mental impairment which . . . can be
expected to last for a continuous period of not less than 12 months
. . . ."  42 U.S.C. § 1382c(a)(3)(A).

      The  Social  Security  Regulations  establish  a  "sequential

---

(child) was filed on behalf of Claimant.  Claimant was awarded at the
initial level of the claim.  Also, Claimant's prior application for
SSI (child) was reviewed on July 17, 1992, and Claimant was awarded
benefits as of December 1, 1987.  These benefits ceased on October 1,
1998.  On February 15, 2006, Claimant protectively filed a prior
application for SSI.  The claim was denied initially on July 26, 2006,
and upon reconsideration on August 24, 2006.

evaluation" for the adjudication of disability claims.  20 C.F.R. § 416.920 (2002).  If an individual is found "not disabled" at any step, further inquiry is unnecessary.  Id. § 416.920(a).  The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment.  Id. § 416.920(b).  If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment.  Id. § 416.920(c).  If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4.  Id. § 416.920(d).  If it does, the claimant is found disabled and awarded benefits.  Id.  If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work.  Id. § 416.920(e).  By satisfying inquiry four, the claimant establishes a prima facie case of disability.  Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981).  The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience.  20 C.F.R. § 416.920(f) (2002).  The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has

the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. <u>McLamore v. Weinberger</u>, 538 F.2d 572, 574 (4th Cir. 1976).

In this particular case, the ALJ determined that Claimant satisfied the first inquiry because she has not engaged in substantial gainful activity since the alleged onset date. (Tr. at 12.) Under the second inquiry, the ALJ found that Claimant suffers from the severe impairments of dysthymia, social phobia, borderline intellectual functioning, and right foot drop. (Tr. at 12-13.) At the third inquiry, the ALJ concluded that Claimant's impairments do not meet or equal the level of severity of any listing in Appendix 1. (Tr. at 14-15.) The ALJ then found that Claimant has a residual functional capacity for medium exertional work, reduced by nonexertional limitations. (Tr. at 15-19.) Claimant has no past relevant work. (Tr. at 19.) Nevertheless, the ALJ concluded that Claimant could perform jobs such as kitchen helper, bagger, and janitorial worker, which exist in significant numbers in the national economy. (Tr. at 20-21.) On this basis, benefits were denied. (Tr. at 21.)

<u>Scope of Review</u>

The sole issue before this court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence. In <u>Blalock v. Richardson</u>, substantial evidence was defined as

4

"evidence which a reasoning mind would accept
as sufficient to support a particular
conclusion. It consists of more than a mere
scintilla of evidence but may be somewhat less
than a preponderance. If there is evidence to
justify a refusal to direct a verdict were the
case before a jury, then there is 'substantial
evidence.'"

Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (quoting

Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)).

Additionally, the Commissioner, not the court, is charged with

resolving conflicts in the evidence.  Hays v. Sullivan, 907 F.2d

1453, 1456 (4th Cir. 1990).  Nevertheless, the courts "must not

abdicate their traditional functions; they cannot escape their duty

to scrutinize the record as a whole to determine whether the

conclusions reached are rational."  Oppenheim v. Finch, 495 F.2d

396, 397 (4th Cir. 1974).

A careful review of the record reveals the decision of the

Commissioner is supported by substantial evidence.

Claimant's Background

Claimant was twenty-one years old at the time of the

administrative hearing.  (Tr. at 29.)  She has an eleventh grade

high school education with special education classes for

mathematics and social studies.  (Tr. at 29.)  In the past, she

worked approximately one week in a fast food restaurant and

approximately two months as a cashier at a general merchandise

store.  (Tr. at 32, 34, 153, 264.)

<u>The Medical Record</u>

The court has reviewed all evidence of record, including the medical evidence of record, and will summarize it below.

<u>Physical Evidence</u>

On June 15, 1991, Claimant was treated at Health Plus Urgent Care for chickenpox.  (Tr. at 228.)

On January 9, 1993, November 19, 1993, January 29, 1998, March 25, 1998, May 11, 2002, May 16, 2002, August 31, 2002, April 10, 2003, May 23, 2004, October 13, 2004, November 1, 2006 and November 17, 2006, Claimant was treated at St. Albans Urgent Care for ear pain, sore throat, and cold symptoms.  (Tr. at 201, 203, 204, 206, 221, 222, 225, 227.)

On August 22, 1994, Claimant was treated at St. Albans Urgent Care for a "twisted left ankle...[caused] while jumping on a trampoline." (Tr. at 223.)  Ernesto R. Tanquilig, M.D. reviewed an x-ray report and determined that "[t]here is a very tiny bony density involving the distal end of the fibula.  I question a tiny cortical fracture.   The rest of the bony structures are unremarkable.   Examination also shows moderate amount of soft tissue swelling about the ankle joint laterally.  Ankle mortise is intact." (Tr. at 224.)

On April 16, 1998, Claimant was treated at St. Albans Urgent Care for a "stoved" right great toe. (Tr. at 219.)  Kenneth L. Dwyer, M.D. reviewed an x-ray report and determined that "[t]here

is no evidence of fracture or other acute bony abnormality." (Tr. at 220.)

On March 6, 2001, Claimant was treated at St. Albans Urgent Care for following a bike wreck which resulted in a "1.5 cm laceration - chin." (Tr. at 217-18.)

Records from D. Richard Lough, M.D., Ears, Nose and Throat ["EN&T"] Associates of Charleston, indicate Claimant was treated from January 29, 2002 to June 6, 2007 for chronic ear pain and ear itching due to eczema. (Tr. at 229-50.)

On February 22, 2002, Claimant was treated at St. Albans Urgent Care for a right fifth finger injury caused by "finger in car door." (Tr. at 215.) John A. Willis, M.D. reviewed an x-ray report and determined "[f]ilms of the right 5th digit disclose no evidence of fracture or dislocation. The bony structures are within the range of normal." (Tr. at 216.)

On September 8, 2003, Claimant was treated at St. Albans Urgent Care for a right foot sprain described as "tripped on the steps and bent great toe backwards." (Tr. at 209.) John F. Mega, M.D. reviewed an x-ray report and determined that "[t]wo projections of the right foot were obtained. There is no radiographic evidence for acute bone or joint abnormality." (Tr. at 210.)

On March 17, 2004, Claimant was treated at St. Albans Urgent Care for a left foot injury caused when she "tried to stop motor

7

scooter with foot, pulled it backwards." (Tr. at 207.) John J. Anton, M.D. reviewed an x-ray report and determined that "[f]ilms of the left foot disclose no evidence of fracture or dislocation. The bony structures are within the range of normal." (Tr. at 208.)

On June 18, 2004, Claimant was treated at St. Albans Urgent Care after stepping in a hole, spraining her right knee and ankle. (Tr. at 205.)

On March 1, 2005, Claimant's eyes were examined at Charleston Eye Care, PLLC, and her vision was found to be "OD SC 20/25-, OS SC 20/20-1." (Tr. at 194-96.)

On January 12, 2007, Claimant was admitted to Charleston Area Medical Center ["CAMC"] for a 0.2 cm skin biopsy from the left ear. (Tr. at 197-98.) Phyllis R. Sawyer, M.D., pathologist, diagnosed "acutely inflamed squamous papilloma." (Tr. at 198, 250.)

On January 20, 2007, D. Richard Lough, M.D., EN&T Associates of Charleston, stated that Claimant was "status post excision of a left posterior ear canal lesion which was a benign squamous papilloma. She's been on Lotrisone cream for eczema...The area of biopsy on left side is healed. There is no evidence of persistent papilloma. Ear canal showed less eczema." (Tr. at 231.)

On March 6, 2007, Claimant was examined at HealthPlus Family Health Center following an accident described as "[m]otorcycle fell on right lower leg, bruise and pain right midshaft." (Tr. at 199.) Mary L. McJunkin, M.D., reviewed an x-ray report of the right lower

leg and determined that there was no acute fracture.  (Id.)

On July 16, 2007, Claimant was admitted to CAMC for a left elbow injury.  (Tr. at 268-72.)  Piayon E. Kobbah, M.D. noted: "Left elbow injury...says she was in an altercation with her boyfriend when she accidentally struck her left elbow on a door hinge and now has pain on the elbow...tender to extension, rotation and flexion but no effusion or erythema.  No laceration." (Tr. at 270.)  Regarding four x-ray views of the left elbow, John Anton, M.D. stated: "The bones and soft tissue unremarkable.  There is no evidence for fracture or dislocation."  (Tr. at 272.)

On November 14, 2007, a State agency medical source evaluated Claimant and completed an Internal Medicine Examination report finding that Claimant had right footdrop and a history of congenital bowel obstruction, status post multiple abdominal surgeries as an infant.  (Tr. at 316-21.)  The evaluator, Kip Beard, M.D., made these general findings upon physical examination:

> The claimant is a 20-year-old female that presents today wearing a right ankle-foot orthosis.  With that on, her gait is limping on the right; with it off, she has an obvious steppage gait consistent with a right footdrop. Her gait was not unsteady or unpredictable and she did not require ambulatory aids.  I do feel she does require her ankle-foot orthosis for prolonged and safer ambulation.  She was able to arise from a seat, and step up and down from the examination table.  She seemed comfortable while seated and supine.  She is able to speak understandably and follow instructions without difficulty.

(Tr. at 318.)

On December 12, 2007, a State agency medical source completed

9

a Physical Residual Functional Capacity Assessment and opined that Claimant could perform light work with the exertional ability to occasionally lift and/or carry 20 pounds, frequently lift and/or carry ten pounds, sit, stand and/or walk (with normal breaks) for a total of about 6 hours in an 8-hour day, and to have unlimited push and/or pull abilities.  (Tr. at 323.)  Claimant was found to be able to occasionally perform all postural activities, except stooping, which she was found to be able to do frequently.  (Tr. at 324.)  Claimant was determined to have no manipulative, visual, communicative or environmental limitations.  (Tr. at 325-26.)  The evaluator, Marcel Lambrechts, M.D. noted:

> This claimant has a right foot drop...She wears a brace on the right ankle but is able to get around.  She has a H/O [history of] abdominal surgery with some bowel resection following intestinal obstruction.  She claims that she has been told that she had "short gut syndrome" although she has not had problems so far.  She is on Rx [prescription] for bipolar disorder and her symptoms seem magnified.  RFC [residual functional capacity] has been reduced as noted.

(Tr. at 327.)

On April 9, 2008, a State agency medical source completed a Physical Residual Functional Capacity Assessment and opined that Claimant could perform medium work with the exertional ability to occasionally lift and/or carry 50 pounds, frequently lift and/or carry 25 pounds, sit, stand and/or walk (with normal breaks) for a total of about 6 hours in an 8-hour day, and to have unlimited push and/or pull abilities.  (Tr. at 345.)  Claimant was found to be

10

able to occasionally perform the postural activities of climbing and balancing, and to be able to frequently perform the postural activities of stooping, kneeling, crouching and crawling. (Tr. at 346.) Claimant was determined to have no manipulative, visual, or communicative limitations. (Tr. at 347-48.) She was found to have no environmental limitations save to avoid concentrated exposure to vibration and avoid even moderate exposure to hazards. (Tr. at 348.) The evaluator, Uma Reddy, M.D. noted:

> 19 years old well built female with H/O [history of] nerve damage leading to right foot drop, credible with some physical activity restrictions, but can compensate and can do walking and standing well. No meds for her physical conditions including her bowl [sic; bowel] problems. She is on meds for her mental issues. ADLs [activities of daily living] are okay physically, mild limitations as noted in this RFC [residual functional capacity], no listing limitations.

(Tr. at 349.)

Psychiatric Evidence

On May 17, 2007, Claimant underwent a "Psycho Social Assessment/Intake" at Process Strategies with William R. Hall, Physician's Assistant ["P.A."]. (Tr. at 255-67.) Mr. Hall stated that Claimant described herself as having a history of social avoidance, anorexia/bulimia, and a "personality change since nerve damage to right leg six years ago." (Tr. at 255.) He noted "no evidence full anorexia nervosa." Id. He noted that Claimant had no past psychiatric history or hospitalizations. (Tr. at 258.) He further noted "reg[ular] use/abuse X [times] 2 years Cannabis."

11

(Tr. at 261.)  He outlined this plan for Claimant: "1) Paxil CR 25 mg... 2) Refer for ind[ividual] therapy, 3) Call prn [according to need] and rtc [return to clinic] 3 weeks." (Tr. at 267.)

On June 15, 2007 and July 17, 2007, Claimant had pharmacological management meetings at Process Strategies with Mr. Hall. (Tr. at 251-54.)  On both occasions, his diagnosis was "Axis I: Bipolar NOS, Social Phobia, H/O [history of] Anorexia/Bulimia, H/O Cannabis Abuse; Axis II: Dependent Pers[onality] Dis[order]; Axis III: H/O bowel resection; migraine; Axis IV: H/O R[ight] leg injury - abnormal gait." (Tr. at 251, 253.)  Regarding Claimant's mental status, Mr. Hall noted Claimant interacted well, had direct eye contact, appropriate appearance and affect, mild dysphoric to irritable mood, adequate to increased sleep, baseline to fair appetite, fair energy, no suicidal or homicidal ideations, normal stream of thought, appropriate content of thought, and was alert and aware. (Tr. at 252, 254.)  On the July 16, 2007, Mr. Hall noted that Claimant "minimizes use of cannabis (one "joint")." (Tr. at 251.)   He prescribed Paxil CR, Abilify 2 mg, Effexor XR 37.5 mg, Neurontin 100 mg, and Lamictal 25 mg. (Tr. at 252, 254.)

On August 16, 2007, Claimant had a pharmacological management meeting at Process Strategies with Mr. Hall. (Tr. at 307-08.)  He prescribed Effexor XR 75 mg and Abilify 5 mg. (Tr. at 307.)  He noted: "Pt [patient] has been euthymic with no random panic episodes - still avoidant and withdrawn - no use of cannabis." Id.

12

Regarding Claimant's mental status, Mr. Hall noted Claimant interacted well, had direct eye contact, appropriate appearance and affect, euthymic mood, adequate sleep, baseline appetite and energy, no suicidal or homicidal ideations, normal stream of thought, appropriate content of thought, and was alert and aware. (Tr. at 308.)

On December 4, 2007, a State agency medical source evaluated Claimant and completed an Adult Mental Profile report. (Tr. at 309-15.) The evaluator, Tracy Smith, M.A., Licensed Psychologist, observed that Claimant's "gait was within normal limits, and she required no aids to ambulate." (Tr. at 309.) However, Ms. Smith went on to note that Claimant's chief complaints were that she had "social phobia with anxiety and depressive tendencies, bipolar traits...nerve damage and drop foot in her right leg." Id. Ms. Smith made these findings:

> MENTAL STATUS EXAMINATION: Appearance: The claimant presented for the evaluation casually dressed with no makeup. Attitude/Behavior: Her attitude was cooperative. Social: Her social interaction was adequate. Her eye contact was good. Spontaneous generation of conversation was appropriate. Speech: The claimant's speech was relevant and coherent. Orientation: The claimant was oriented X4. Mood: The claimant's observed mood was somewhat anxious initially, but overall within normal limits. Affect: Broad. Thought Process: Within normal limits. Thought Content: Within normal limits. Perceptual: Within normal limits. Insight: Fair. Judgment: Moderately deficient as evidenced by a scaled standard score of 4 on the Comprehension subtest of the WAIS-III. Suicidal/Homicidal Ideation: Denied. Immediate Memory: Within normal limits as evidenced by recall of four of four words. Recent Memory: Recent memory was markedly

deficient as evidenced by delayed recall of only one of four words after 10 minutes. <u>Remote Memory</u>: Within normal limits. <u>Concentration</u>: Moderately deficient as evidenced by a scaled standard score of 5 on the Digit Span subtest of the WAIS-III. <u>Psychomotor Behavior</u>: Within normal limits.

<u>INTELLECTUAL ASSESSMENT</u>:

<u>WAIS-III</u>:...
Verbal IQ            69
Performance IQ       73
Full Scale IQ        68...
<u>WAIS-III VALIDITY</u>: The claimant appeared to provide adequate effort on psychological testing procedures. She does come with a history documented by Kanawha County Schools for having intellectual testing completed in January of 1996 with a WISC-IV Full Scale IQ of 75, with achievement testing done in 1996 and 2001 that were commensurate with what was achieved at this time, if not somewhat higher. Overall Validity: Her final results were concerning in that mild mental impairment scores are not consistent with what has been previously obtained and expected. Therefore, use of validity of scores should be made with caution.

<u>WRAT-4</u>:

| <u>Subject</u> | <u>Standard Score</u> | <u>Grade Score</u> |
|---|---|---|
| Word Reading | 81 | 6.4 |
| Spelling | 86 | 7.7 |
| Math Computation | 78 | 5.1 |

<u>WRAT-4 VALIDITY</u>: Claimant's performance on the WRAT-4 was considered to be valid for interpretation and consistent with that of previous achievement testing provided by Kanawha County Schools for review.

<u>DIAGNOSTIC IMPRESSION (DSM-IV DIAGNOSES)</u>:

| Axis I | 296.90 | Mood disorder, NOS |
|---|---|---|
| | 300.00 | Anxiety disorder, NOS |
| Axis II | V62.89 | Borderline intellectual functioning |
| Axis III | | History of bicycle accident causing neurologic damage and physical damage |

<u>DIAGNOSTIC RATIONALE</u>: The claimant was diagnosed with a mood disorder with a possibility of bipolar process existing, but not completely documented in most recent

14

medical records.  Anxiety disorder, NOS, was diagnosed
without social phobia due to the fact that claimant has
reported that she is able to go out to eat and go to the
movies and hang out with her friends and boyfriend
without much difficulty.  So the symptom presentation is
not consistent with what would be considered a true
social phobia at this time.  Borderline intellectual
functioning was diagnosed rather than learning disorder
or mild mental impairment, due to the fact that this best
describes her difficulties with her learning disorders
and more consistent with that of previously obtained and
currently obtained IQ scores.  Achievement testing shows
variability in performance on all occasions administered
and compared to.

PROGNOSIS: Fair with adequate educational and job
training and emotional stabilization.

DAILY ACTIVITIES: Typical Day: The claimant awakes around
9 a.m., watches television, gets on the computer, cleans
around the house, does laundry, hangs out with her
boyfriend when she wants to, and usually is in bed around
midnight.  Activities List: The claimant likes to play on
the computer, watch television, does housework and
laundry, hangs out with her boyfriend, and goes out to
eat and to movies with her friends and him.

SOCIAL FUNCTIONING: During the Evaluation: Within normal
limits, as evidenced by ability to interact adequately
with examiner and staff without any type of difficulties
or reservations.  Reported Social Activities: She hangs
out with her boyfriend and goes out to eat and to the
movies with friends.

PERSISTENCE: Within normal limits.  Claimant was able to
stay on task without much difficulty or redirection.

PACE: Within normal limits, as ability level of claimant
to stay on task, completing at a regular pace, was
appropriate.

CAPABILITY: If granted benefits, it is felt that this
claimant would not be capable of managing her own
finances.

(Tr. at 311-14.)

On December 12, 2007, a State agency medical source completed

15

a Psychiatric Review Technique form.   (Tr. at 330-43.)   The evaluator, Rosemary L. Smith, Psy. D., Licensed Psychologist, found Claimant's impairments were not severe.  (Tr. at 330.)   She found Claimant had mild restriction of activities of daily living, difficulties in maintaining social functioning, difficulties in maintaining concentration, persistence, or pace, and no episodes of decompensation.  (Tr. at 340.)   She stated that evidence does not establish the presence of the "C" criteria.  (Tr. at 341.)   Dr. Smith concluded:

> Claimant is not credible.   In the AFR, she denied spending time with others yet at the CE [clinical examination], reported that she hangs out with her boyfriend, goes out to eat, and goes to movies with her friends and him.   Social functioning was WNL [within normal limits].   At the CE, she reported that her last use of marijuana was two years prior, yet her treating source noted that she reported that she used from ages 17 to 19 and continues to use on occasion.   The claimant reported making "poor" grades in school, yet the evidence from the school system indicates adequate grades until her last year.
>
> The psychologist gave a diagnosis of BIF [borderline intellectual functioning] with questionably valid scores. The WRAT-4 showed word reading and spelling to be in the low average range.   Previous scores showed reading in the average range.   Her treating source does not opine a BIF Dx [diagnosis].
>
> There is no evidence of significant functional limitations due to a mental impairment.

(Tr. at 342.)

On April 19, 2008, a State agency medical source completed a Psychiatric Review Technique form.   (Tr. at 352-65.)   The evaluator, Jeff Harlow, Ph. D., Licensed Psychologist, found

16

Claimant's impairments were not severe. (Tr. at 352.) He found Claimant had no restriction of activities of daily living, difficulties in maintaining social functioning, difficulties in maintaining concentration, persistence, or pace, and no episodes of decompensation. (Tr. at 362.) He stated that evidence does not establish the presence of the "C" criteria. (Tr. at 363.) Dr. Harlow concluded:

> Comments about functional capacities made by the claimant are partially credible because they are externally inconsistent with clinical results of the consultative evaluation, which indicates that all KEY-Functional Capacities are within normal limits. Note, since IQ scores are invalid moderate rating of concentration is also invalid. Therefore, it is concluded that mental impairments are not severe.

(Tr. at 364.)

On September 2, 2008, John R. Atkinson, M.A., Licensed Clinical Psychologist, evaluated Claimant and provided a psychological assessment report for Claimant's representative. (Tr. at 366-81.) Mr. Atkinson noted:

> The patient denies any mania or hypomania although it is noted that she had just told me that she had Bipolar Disorder. Symptoms of mania or hypomania were gone over with her in detail and she does not have them and never did...

> It is felt that the patient does not actually have social phobia although she has been diagnosed with that in the past but she has an avoidant personality which has symptoms similar to social phobia but which are more widespread...

> It is noted that the patient went to Process Strategies where she was placed on two different antiseizure medications at the same time and the reason for this is

17

unknown because she has never had a seizure or any indication of seizure activity...

The patient states she started going to Process Strategies at age 18, does not go there now because she has no insurance. She states that actually, she never saw a medical doctor at that facility but just saw a physician's assistant and I'm not sure that is legal. I think she is required to have been seen by a doctor at some point. It is also noted that at Process Strategies, she was diagnosed with disorders, which she does not have, and given medications for disorders, which she also does not have. She states that she has never been given medication for depression by a general physician. She has never been treated for alcohol or drug abuse...

MEDICATIONS:
None, it is noted that the patient has taken Abilify for Bipolar Disorder which she does not have and never did. She was also prescribed Effexor for "social phobia." Effexor is an antidepressant and has nothing to do with social phobia. The patient has those prescriptions now but states she can't afford to fill them...she was given both Neurontin and Lamictal which are seizure medications and have nothing whatsoever to do with mood shifts...the patient stated that she had never seen an actual doctor at Process Strategies...

EDUCATIONAL HISTORY:
The patient attended public school to the 11th grade and quit school at age 17 to go live with her boyfriend...She repeated the 11th grade, quit school, went back and quit again. The patient states that she was in special education off and on, in various classes but not all of them, that her grades were good, "if I went to school"...After leaving school, the patient states she went to GED classes for one week but quit, "gave up, didn't want to go - alone." She states that she can read labels and directions, does not know how to count and make change and does not know how to write checks.

(Tr. at 367-70.)

Mr. Atkinson also provided a Mental Status Examination of

Claimant, wherein he concluded:

APPEARANCE: In appearance, the patient was noted to be an

18

average size, well-nourished, right-handed male (sic) of 20 years with blonde hair, pulled back, blue eyes, a very fair complexion and sort of Scandinavian looking.

ATTITUDE/BEHAVIOR: Her attitude was open, frank and candid.

SOCIAL: Social rapport was easy.

SPEECH: Speech patterns tended to be coherent but somewhat hesitant and unsure.

ORIENTATION: Today the patient was partially oriented as to time, wasn't quite sure of the month but knew the date and the year.  She was well oriented as to place and person.

MOOD: Observed mood was depressed.

AFFECT: Broad but the patient also displayed occasional lability with crying.

THOUGHT PROCESS: Associations are relevant and the stream of thought is normal.

THOUGHT CONTENT: The patient has adopted paranoid attitudes of distrust resulting from mistreatment by her boyfriends and this is superimposed upon her avoidant personality in which she feels that people are staring at her, watching her, judging her and that she will do something embarrassing.

PERCEPTUAL: The patient denies any hallucinations or illusions.

INSIGHT: Fair.

JUDGMENT: Within normal limits; the patient stating that if she found a letter on the street, she would put it in the post office.

IMMEDIATE MEMORY: Moderately impaired; the patient recalled two of four words.

DELAYED MEMORY: Markedly impaired; the patient recalled none of the four words.

REMOTE MEMORY: Broadly intact as assessed by history recall.

CONCENTRATION: Moderately deficient based upon a WMI Index Score of 71.

ABSTRACT REASONING: Mildly deficient based upon a Similarities Subtest Raw Score of 15 Scale Score of 7 and Standard Score of 82.

PSYCHOMOTOR BEHAVIOR: Normal based on clinical observation.

PERSISTENCE: Average as demonstrated by examination behavior.

PACE: Average as observed during the examination.

SOCIAL FUNCTIONING: Within normal limits during the interview based on observation of social interaction.

19

(Tr. at 371-72.)

Mr. Atkinson also provided test analysis of Claimant. Her WAIS-III Scores were Verbal IQ 73, Performance IQ 75, Full Scale IQ 72, Verbal Comprehension Index 78, Perceptual Organization Index 78, Working Memory Index 71. (Tr. at 372.) Her Wide Range Achievement Test scores were Reading Grade Level 7.4, Standard Score 89; Arithmetic Grade Level 4.3, Standard Score 77. (Tr. at 373.) Regarding Claimant's scores, Mr. Atkinson opined:

> These scores are felt to be valid due to average effort. It is noted that the patient stated that she had this test only about two or three months ago. She remembered everything on it but has no idea where that was or who the examiner was. No records of that are available. The patient has a seventh grade literacy level, was in special education, "off and on, some classes," and onset is presumed to be before age 22 as manifested by special education placement.

Id.

Mr. Atkinson concluded that Claimant had Dysthymic Disorder, Borderline Intellectual Functioning, and Avoidant Personality Disorder with a 55 GAF, indicating moderate to serious impairment in the current and past year. (Tr. at 373-74.) He further opined:

> She is of borderline intelligence and actually in face-to-face conversations, is easily confused and appears more dull than that. It is felt that the patient would have extreme difficulty in any type of employment situation where she had to deal with other people, where she was under any kind of pressure or stress or where she had to perform intellectually such as making change, operating a cash register, remembering instructions, etc....It is noted that Avoidant Personality Disorder is much more disabling than Social Phobia would be. PROGNOSIS: Uncertain, if the patient is treated again, she should go somewhere she is properly diagnosed and

given the correct medications for her actual conditions.
CAPABILITY: If benefits are granted, the patient would
not be able to manager (sic) her own financial affairs
including money payments due to her inexperience, low
intellectual status and immaturity.

Id.

On September 2, 2008, Mr. Atkinson also filled out a form
titled "MENTAL IMPAIRMENT QUESTIONAIRE (sic) RFC" wherein he
concluded that Claimant was "Slightly Limited" in the ability to
understand, remember and carry out very short and simple
instructions, ask simple questions or request assistance, maintain
socially appropriate behavior and to adhere to basic standards of
neatness and cleanliness, and to be aware of normal hazards and
take appropriate precautions. (Tr. at 375-77.)  He marked that
Claimant was "Moderately Limited" in the ability to remember work-
like procedures, maintain attention for extended periods, make
simple work-related decisions, complete a normal work day and work
week without interruptions from psychologically based symptoms and
to perform at a consistent pace without an unreasonable number and
length of rest periods, accept instructions and respond
appropriately to criticism from supervisors, get along with
coworkers or peers without unduly distracting them or exhibiting
behavioral extremes, travel in unfamiliar places or use public
transportation, and set realistic goals or make plans independently
of others.  Id.  He marked that Claimant was "Markedly Limited" in
the ability to understand, remember and carry out detailed

21

instructions, maintain regular attendance and be punctual within customary tolerances, sustain an ordinary routine without supervision, work in coordination or proximity to others without being unduly distracted by them, interact appropriately with the general public, and respond appropriately to changes in a routine work setting.  Id.  Mr. Atkinson found that Claimant was not "Extremely Limited" in any area.  Id.

On September 2, 2008, Mr. Atkinson also filled out a form titled "MENTAL ASSESSMENT OF ABILITY TO DO WORK-RELATED ACTIVITIES" wherein he marked "None" regarding limitations in the ability to understand, remember, carry out simple job instructions and to maintain personal appearance; "Slight" regarding limitations in the ability to follow rules; "Moderate" regarding limitations using judgment, interacting with supervisors, functioning independently, maintaining attention/concentration, understanding, remembering, and carrying out detailed, but not complex job instructions, behaving in an emotionally stable manner, relating predictably in social situations, and demonstrating reliability; "Marked" regarding limitations relating to co-workers, dealing with the public, dealing with work stresses, understanding, remembering and carrying out complex job instructions. (Tr. at 379-81.)

Education Evidence

Education records show Claimant attended Kanawha County Schools from Kindergarten enrollment on September 1, 1993 through

22

December 14, 2006, when a "drop" is indicated in the eleventh grade following Claimant's retention in that grade following the 2004-05 school year.  (Tr. at 180-81.) Claimant's grades for K-10 are a mixture of As, Bs, Cs, Ds, and one F (7th grade Music class).  (Tr. at 181.)  It is notable that during the eleven years of recorded attendance, Claimant had an average of 17 absences per school year. (Id.)

Kanawha County Schools records dated September 23, 2003 indicate that Claimant had WISC-III intelligence testing on January 29, 1996 showing her full scale IQ to be 75 (Verbal 87, Performance 66).  (Tr. at 185.)

Claimant's Challenges to the Commissioner's Decision

Claimant asserts that the Commissioner's decision is not supported by substantial evidence because the ALJ found that Claimant did not meet or equal 12.05C when she had a valid verbal, performance, or full scale IQ of 60 to 70 and a physical or other mental impairment imposing an additional and significant work-related limitation or function. (Pl.'s Br. at 3-5.)

The Commissioner asserts that substantial evidence supports the ALJ's decision that Claimant's impairment did not meet or equal Listing 12.05C because the evidence of record shows that she did not have a valid IQ score of 60 through 70 and was not diagnosed with mental retardation.  (Def.'s Br. at 1-10.)

23

<u>12.05C Mental Impairments</u>

Claimant asserts that the Commissioner's decision is not supported by substantial evidence because the ALJ found that Claimant did not meet or equal 12.05C when she had a valid verbal, performance, or full scale IQ of 60 to 70 and a physical or other mental impairment imposing an additional and significant work-related limitation or function. (Pl.'s Br. at 3-5.)  Specifically, Claimant argues:

> According to the DSM-IV, all IQ scores have a margin of error, which is equivalent to a five-point overlap.  All of the scores obtained are well within the margin of error, and therefore the claimant meets the IQ part of 12.05(c)...

> Also, the ALJ found that the claimant has a severe physical impairment with regard to her right drop foot (Transcript pg. 13)...

> The claimant's IQ scores in combination with her physical and other mental impairments disable the claimant, and the ALJ erred in not finding that the claimant meets or equals 12.05(c).

(Pl.'s Br. at 3-5.)

The Commissioner responds that substantial evidence supports the ALJ's decision that Claimant's impairment did not meet or equal Listing 12.05C "when the facts reflect that she did not have a valid IQ score of 60 through 70 and was not diagnosed with mental retardation." (Def.'s Br. at 1.)  The Commissioner further argues:

> Plaintiff's erroneously argues that she met the listing because her IQ scores fell within the margin of error (Pl's Br. at 4).  The language in the regulations concerning the mental retardation listing is clear.  The regulations contain no language or arguable ambiguity

24

> authorizing the ALJ to take into account a range of error on IQ tests.  Where the listing regulations contemplate a range, the regulations have specifically directed consideration of the range.  See e.g., 20 C.F.R. pt. 404, subpt. P, app. 1, §12.02A(7).

(Def.'s Br. at 8.)

In regard to the evidence regarding Claimant's impairments, the ALJ made these findings:

> The claimant underwent consultative psychological evaluation by Tracy Smith, M.S. on October 29, 2007, and she obtained a verbal IQ of 69, performance IQ of 73, and full scale IQ of 68 on WAIS-III testing.  However, Ms. Smith noted the claimant had history documented by Kanawha County Schools of having intellectual testing completed in January of 1996 with a WISC-IV full scale IQ of 75.  Ms. Smith further indicated that results in the mild mental impairment scores were not consistent with what had been previously obtained and expected, therefore use of validity of the claimant's current scores should be made with caution.  The WRAT-4 testing indicated the claimant could read at the 6.4 grade level, spell at the 7.7 grade level, and perform math at the 5.1 grade level.  Ms. Smith diagnosed mood disorder, NOS [not otherwise specified]; anxiety disorder, NOS; and borderline intellectual functioning.

> The claimant's representative referred the claimant for psychological evaluation by John Atkinson, M.A., on September 2, 2008, during which she obtained a verbal IQ of 73, performance IQ of 75, and full scale IQ of 72.  The WRAT indicated the claimant could read at the 7.4 grade level and perform arithmatic at the 4.3 grade level.  Mr. Atkinson diagnosed dysthymic disorder, borderline intellectual functioning, and avoidant personality disorder (Exhibit 20F).

> Based on the objective findings the undersigned finds the claimant has severe impairments of dysthymia, social phobia, borderline intellectual functioning, and right foot drop.

(Tr. at 13.)

In order to meet the criteria of Listing 12.05C, the

25

regulations require that Claimant must meet the introductory language of Listing 12.05C, which states that "[m]ental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22." 20 C.F.R., Subpt. P, App. 1, § 12.05 (2006); see also § 12.00A (stating that for Listing 12.05, Claimants must satisfy the diagnostic description in the introductory paragraph and any one of the four sets of criteria).   Listing 12.05C also requires "[a] valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing additional and significant work-related limitation of function." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05C (2006).

The Fourth Circuit has held that a Claimant's additional "severe" impairment qualifies as a significant work-related limitation for the purpose of listing § 12.05C.  Luckey v. Bowen, 890 F.2d 666 (4th Cir. 1989).  A "severe" impairment is one "which significantly limits [one's] ability to do basic work activities." 20 C.F.R. § 404.1520(c) (2006).  In Luckey, the Court ruled that

> Luckey's inability to perform his prior relevant work alone established the significant work-related limitation of function requirement of § 12.05C.  Further, the Secretary has defined a severe impairment or combination of impairments as those which significantly limit an individual's physical or mental ability to do basic work activities.  The Secretary's finding that Luckey suffers from a severe combination of impairments also establishes

26

the second prong of § 12.05C.

Id. at 669.

In her decision, the ALJ discussed at length 12.05 and specifically "paragraph C" criteria.  The ALJ made the following findings:

> Turning back to listing 12.05, the requirements in paragraph A are met when there is mental incapacity evidenced by dependence upon others for personal needs (e.g., toileting, eating, dressing, or bathing) and inability to follow directions, such that the use of standardized measures of intellectual functioning is precluded.  In this case, these requirements are not met because the claimant has no evidence of mental incapacity.  In fact, the claimant's activities of daily living reveal she functions fairly well.
>
> As for the "paragraph B" criteria, they are not met because the claimant does not have a valid verbal, performance, or full scale IQ of 59 or less.
>
> Finally, the "paragraph C" criteria of listing 12.05 are not met because the claimant does not have a valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function.  During consultative psychological evaluation by Ms. Smith the claimant obtained a verbal IQ of 69, performance IQ of 73, and full scale IQ of 68.  However, as discussed above, Ms. Smith noted that records from Kanawha County Schools reveal during WISC-III testing on January 29, 1996, the claimant obtained a full scale IQ of 75 (Exhibit [12E]).  Furthermore during psychological evaluation by Mr. Atkinson on September 2, 2008, the claimant obtained a verbal IQ of 73, performance IQ of 75, and full scale IQ of 72 during WAIS-III testing.  As noted by Ms. Smith and Mr. Atkinson the evidence supports a finding the claimant functions intellectually in the borderline range and thus does not meet or equal Section 12.05(C).  The claimant reports using her computer and doing word search (puzzles), which certainly does not support the credibility of low IQ scores.

(Tr. at 15.)

The court proposes that the presiding District Judge **FIND** that the ALJ did not err in finding that Claimant did not meet Listing 12.05C.  The intellectual testing upon which Claimant attempts to rely was deemed unreliable by the testing psychologist, Tracy P. Smith, M.A.  Ms. Smith reached this conclusion: "Overall Validity: Her final results were concerning in that mild mental impairment scores are not consistent with what has been previously obtained and expected.  Therefore, use of validity of scores should be made with caution."  (Tr. at 312.)  The ALJ properly accepted the psychologist's opinion that the IQ scores were invalid and therefore, found that Claimant functioned in the borderline range of intelligence and did not meet or equal Listing 12.05C.  The ALJ's finding is further supported by the 2008 intellectual assessment of Psychologist John R. Atkinson that showed a verbal IQ score of 73, performance IQ score of 75, and a full scale IQ of 72.  (Tr. at 372.)   Mr. Atkinson also diagnosed Plaintiff with borderline intellectual functioning.  (Tr. at 373.)

Even if Claimant's borderline intellectual functioning were severe, Claimant did not meet Listing 12.05C.  Claimant's valid IQ scores do not fall within the range required by Listing 12.05C.  Also, the remaining requirement, that Claimant have mental retardation, i.e., significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the development period with evidence

demonstrating or supporting onset of the impairment before age 22, is not present.

As this court in <u>Mann v. Astrue</u>, 2008 WL 906346, *11 (S.D. W. Va. March 31, 2008), explained:

> [O]ne of the essential features of mental retardation is significant deficits in adaptive functioning.  20 C.F.R. Pt. 404, Subpt. P, App. 1 §12.00; <u>see also</u>, <u>The Merck Manual of Diagnosis and Therapy</u> 2259 (Mark H. Beers, M.D. & Robert Berkow, M.D., eds.; 17th ed. 1999)(defining mental retardation as "significantly subaverage intellectual quotient with related limitations in two or more of the following: communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure, and work.").  Also, according to the <u>Diagnostic and Statistical Manual of Mental Disorders</u>, 4th Edition, ("DSM-IV")(1994), one of the essential features of mental retardation is significant deficits in adaptive functioning.  <u>Id</u>. at 39-40.  Adaptive functioning refers to how effectively an individual copes with common life demands and how well he meets the standards of personal independence expected of someone in his particular age group, sociocultural background, and community setting.

While Listing 12.05's introductory paragraph may not require "a formal diagnosis of mental retardation," <u>Maresh v. Barnhart</u>, 438 F.3d 897, 899 (8th Cir. 2006) (Pl.'s Br. at 9), Claimant does not meet any part of the introductory requirement of Listing 12.05C.  Claimant has not shown "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the development period," i.e., before age 22."  20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.05.

<u>Other Arguments</u>

Claimant also makes an argument that the ALJ "contradicted

herself" by finding that the claimant does not meet the IQ requirement of 12.05C in her decision when during the hearing she had stated that Claimant "does meet the first part [of 12.05C] does have IQ score of 60-70, but needs other impairment – not so sure.". (Pl.'s Br. at 3.)

The Commissioner responds that this argument is without merit because although the ALJ did mention Listing 12.05C during the administrative hearing (Tr. 44-45), "the administrative hearing is not the final decision.  20 C.F.R. §416.1481.  The ALJ made a listing determination in her administrative decision (Tr. 14-15)." (Def.'s Br. at 7.)

The undersigned proposes that the presiding District Judge **FIND** that the ALJ's administrative decision is clear and without conflict regarding a determination that Claimant did not meet or equal Listing 12.05C.

Claimant also argues that the ALJ erred in opining that Claimant's use of a computer and doing word search puzzles did not support the credibility of extremely low IQ scores.  (Tr. at 15.) Claimant asserts

> Using a computer and having extremely low IQ scores are not mutually exclusive.  The majority of school systems start teaching children to use a computer when they are in kindergarten.  The claimant has been exposed to computers her entire life, and the fact that she can navigate the internet does not preclude the idea that she has very low IQ scores.  The same concept can be said for doing word search.  The claimant may attempt to pass the time with puzzles and still score extremely low IQ scores.

(Pl.'s Br. at 4.)

The undersigned proposes that the presiding District Judge **FIND** that this argument is without merit because an ALJ is permitted, indeed is required, to use his or her reasoning powers regarding a Claimant's complaints and their consistency with the objective evidence before the judge. The conclusions drawn by the ALJ are reasonable.

For the reasons set forth above, it is hereby respectfully **RECOMMENDED** that the presiding District Judge **AFFIRM** the final decision of the Commissioner and **DISMISS** this matter from the court's docket.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable Thomas E. Johnston, District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and then three days (mailing/service) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection. Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of <u>de novo</u> review by the District Court and a waiver of appellate review by the Circuit Court of Appeals.  <u>Snyder v. Ridenour</u>, 889 F.2d 1363, 1366 (4th Cir. 1989); <u>Thomas v. Arn</u>, 474 U.S. 140, 155 (1985); <u>Wright v. Collins</u>, 766 F.2d 841, 846 (4th Cir. 1985); <u>United States v. Schronce</u>, 727 F.2d 91, 94 (4th Cir. 1984).  Copies of such objections shall be served on opposing parties, Judge Johnston, and this Magistrate Judge.

The Clerk is directed to file this Proposed Findings and Recommendation and to transmit a copy of the same to counsel of record.

<u>  January 26, 2011  </u>
      Date

                                 *Mary E. Stanley*

                                  Mary E. Stanley
                         United States Magistrate Judge